**No. 23-11427**

# United States Court of Appeals

*for the*

# Eleventh Circuit

KEITH EDWARDS, as Guardian and Conservator for JERRY BLASINGAME,

*Plaintiff-Appellant,*

— v. —

OFFICER J. GRUBBS, #6416, THE CITY OF ATLANTA,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
(HONORABLE STEVE C. JONES, U.S. DISTRICT JUDGE)

## INITIAL BRIEF OF APPELLANT

CHRISTOPHER P. DESMOND
VEN JOHNSON LAW
*Attorneys for Plaintiff-Appellant*
535 Griswold Street, Suite 2600
Detroit, Michigan 48226
(313) 324-8300

CP COUNSEL PRESS    (800) 4-APPEAL • (809361)

## <u>CERTIFICATE OF INTERESTED PERSONS</u>

Plaintiff certifies that the following persons and entities have an interest in the outcome of this action:

-Atlanta Police Department

-Blasingame, Jerry (Plaintiff-Appellant)

-City of Atlanta

-Dearing Jr., James E. (Counsel for Defendant-Appellee)

-Desmond, Christopher P. (Counsel for Plaintiff-Appellant)

-Eason, Kimberly Delk (Counsel for Defendant-Appellee)

-Edwards, Keith (Plaintiff-Appellant)

-Grubbs, Jon (Defendant-Appellee)

-Johnson, Vernon R. (Counsel for Plaintiff-Appellant)

-Jones, Steve C. (District Court Judge)

-Melton, Harold D. (Counsel for Defendant-Appellee)

-Miller, Stacy (Counsel for Defendant-Appellee)

-Peeler, Charles E. (Counsel for Defendant-Appellee)

-Tobin, Darren M. (Counsel for Plaintiff-Appellant)

-Waldbeser, Elizabeth P. (Counsel for Defendant-Appellee)

*/s/ Christopher P. Desmond*
*Counsel for Plaintiff-Appellant*

C-1

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Plaintiff-Appellant Keith Edwards, as Guardian and Conservator for Jerry Blasingame, respectfully requests oral argument. This appeal is highly fact-intensive, as it arises out of a nearly two week long trial that culminated in a $100 million dollar verdict in Plaintiff's favor. Oral argument will assist the Court with its understanding of the record and with its ultimate determination.

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS .................................................C-1

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................................i

TABLE OF AUTHORITIES ...........................................................................iv

JURISDICTIONAL STATEMENT .....................................................................1

ISSUES PRESENTED FOR REVIEW .................................................................2

STATEMENT OF THE CASE............................................................................3

    A.    Introduction ..............................................................................3

    B.    The Underlying Use of Force...................................................4

    C.    The Significance of the Body Worn Camera Policy Violations .........12

    D.    Relevant Procedural History ...................................................20

STANDARD OF REVIEW ..............................................................................22

SUMMARY OF ARGUMENT ..........................................................................22

ARGUMENT ...............................................................................................24

    I.    The District Court erred in granting Defendant's Motion for Judgment as a Matter of Law as it relates to Plaintiff's claim of municipal liability ..............................................................24

    II.    The District Court erred in denying Plaintiff's Motion for Relief from Judgment relative to his claim under O.C.G.A. § 42-5-2 ...............................................................................37

        a.    Mr. Blasingame Was Injured in the Custody of Atlanta Police Department....................................................38

        b.    Mr. Blasingame Qualifies as An Inmate under O.C.G.A. § 42-5-2.....................................................39

    III.    The District Court erred in denying Plaintiff's motion for costs and fees as the prevailing party ................................41

        A.    Reasonable attorney fees............................................42

B.   Plaintiff counsel's experience & support for requested fees *Lead Counsel* ........................................................45

Second Chair Trial Counsel-Ayanna D. Hatchett ..........46

Local Counsel ....................................................................46

Predecessor Counsel ........................................................47

C.   Fee award for support for paralegals .........................................48

D.   Plaintiff is entitled to be reimbursed for his reasonable costs........................................................................49

E.   Plaintiff is entitled to recover post and prejudgment interest ........................................................................51

CONCLUSION ........................................................................52

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adickes v. S. H. Kress & Co.,*
  398 U.S. 144 (1970)..............................................................................25

*Blum v. Stenson,*
  465 U.S. 886 (1984)......................................................................... 42, 43

*City of Canton v. Harris,*
  489 U.S. 378 (1989)..............................................................................28

*Cherokee County v. N. Cobb Surgical Assocs., P.C.,*
  221 Ga. App. 496 (1996) ......................................... 26, 27, 28, 29, 32

*Connick v Thompson,*
  563 U.S. 51; 131 S Ct 1350; 179 L Ed 2d 417 (2011) ........................32

*Crawford Fitting Co. v. J.T. Gibbons, Inc.,*
  482 U.S. 437 (1987)..............................................................................50

*Delong Equip. Co. v. Washington Mills Electro Minerals Corp.,*
  997 F.2d 1340 (11th Cir. 1993) ...........................................................51

*Dillard v. City of Greensboro,*
  213 F.3d 1347 (11th Cir. 2000) ...................................................... 41, 42

*Doe v Celebrity Cruises, Inc,*
  394 F3d 891 (CA 11, 2004).................................................................22

*Dowdell v Apopka,*
  698 F.2d 1181 (11 th Cir. 1983) ...................................................... 50-51

*Epps v City of Denver,*
  2022 U.S. Dist. LEXIS 35895 (March 1, 2022) .......................... 33, 35

*Farrar v. Hobby,*
  506 U.S. 103 (1992)..............................................................................41

*Faught v. American Home Shield Corp.,*
  668 F.3d 1233 (11 Cir. 2011 ) .............................................................43

*Georgia Ass'n of Retarded Citizens v. McDaniel,*
  855 F.2d 794 (11th Cir. 1988) .............................................................51

*Gilmere v. City of Atlanta*,
 476 U.S. 1115 (1986)...........................................................................32

*Gold v City of Miami*,
 151 F3d 1346 (11th Cir., 1998) ...................................................... 28, 30

*Hardaway Constructors, Inc. v. Browning*,
 176 Ga. App. 530, cert. denied 475 U.S. 1095 (1986) ........................52

*Hensley v. Eckerhart*,
 461 U.S. 424 (1983)....................................................... 41, 42, 43, 44

*Hewitt v. B.F. Goodrich Co.*,
 732 F.2d 1554 (11th Cir. 1984) ...........................................................37

*Johnson v. Georgia Highway Express, Inc.*,
 488 F.2d 714 (5th Cir. 1974) ...............................................................43

*Johnson v. University College*,
 706 F.2d 1205 (11th Cir. 1983) ...........................................................50

*Jones v Louisville/Jefferson County Metro Gov't*,
 482 F.Supp.3d 584 (2020) ......................................................... 33, 34, 35

*Kenny A. ex rel. Winn v. Perdue*,
 532 F.3d 1209 (11th Cir. 2008) ...........................................................51

*Lang v. South Ga. Inv. Co.*,
 38 Ga. App. 430, (1928) .....................................................................51

*Lewis v City of West Palm Beach*,
 561 F.3d 1288 ................................................................................... 28

*Macon-Bibb County Hosp. Auth. v. Reece*,
 228 Ga. App. 532 (1997) ....................................................................38

*Macon-Bibb Cty. Hosp. Auth. v. Hous. Cty.*,
 207 Ga. App. 530 (1993) ............................................................... 39, 40

*Manor Healthcare Corp. v. Lamela*,
 929 F.2d 633 (11th Cir. 1991) ........................................................ 49-50

*Monroe v. Pape*,
 365 U.S. 167 (1961)......................................................................24-25

v

*Missouri v. Jenkins,*
   491 U.S. 274 (1989)...........................................................................48

*Norman v. Haus. Auth. of Montgomery,*
   836 F.2d 1292 (11th Cir. 1988) ................................................... 43,44

*Northcross v. Board of Educ.,*
   611 F.2d 624 (1979)..........................................................................50

*Padwjian v. Aventura Limousine & Transp. Serv.,*
   441 Fed. Appx. 684 (11th Cir. 2011)...................................................44

*Perdue v. Kenney A. ex rel. Winn,*
   559 U.S. 542 (2010)...........................................................................44

*Saylor v. Barrow County,*
   2010 U.S. Dist. LEXIS 154614 (N.D. Ga. Mar. 9, 2010) ...................40

*Sigley v. Kuhn,*
   2000 U.S. App. LEXIS 1465 (6th Cir. Jan. 31, 2000).........................50

*Threatt v. Forsyth County,*
   262 Ga. App. 186 (2003) ...................................................................51

*Trotter v. Columbia Sussex Corp.,*
   2010 U.S. Dist. LEXIS 7625 (S.D. Ala. Jan. 29, 2010) ......................50

*Vineyard v. Co of Murray,*
   990 F.2d 1207 (11th Cir., 1993) ........................................................32

*Walker v. Comm'r, SSA,*
   844 F. App'x 104 (11th Cir. 2021) ....................................................48

*Weissman v. Williams,*
   2018 U.S. Dist. LEXIS 229451 (M.D. Ga. Aug. 28, 2018) ...............44

**Statutes & Other Authorities:**

28 U.S.C. § 1331 ...................................................................................1

28 U.S.C. § 1291 ...................................................................................1

28 U.S.C. § 1920...................................................................................50

28 U.S.C. § 1961(a) ..............................................................................51

28 U.S.C. § 1961(b) ..............................................................................51

42 U.S.C. § 1983 ................................................................................. *passim*

42 U.S.C. § 1988 ........................................................................... 50, 51

42 U.S.C. § 1988(b) ................................................................................41

Fed. R. App. P. 32(a)(7)(B) ...................................................................53

Fed. R. Civ. P. 50 ...................................................................................22

Fed. R. Civ. P. 54(d) ....................................................................... 49, 50

Fed. R. Civ. P. 54(d)(l) ..........................................................................49

O.C.G.A. § 7-4-12 ..................................................................................51

O.C.G.A. § 42-5-2 ................................................................. 23,37, 39, 40

O.C.G.A. § 51-12-14 ..............................................................................51

# JURISDICTIONAL STATEMENT

**District Court:** The United States District Court for the Northern District of Georgia had subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331, as it involves a federal question. Specifically, Plaintiff alleged that defendants violated Mr. Blasingame's Fourth Amendment rights to be free from excessive force and were therefore liable for his injuries pursuant to 42 USC § 1983.

**Court of Appeals:** This United States Court of Appeals for the Eleventh Circuit has jurisdiction over this matter pursuant to 28 USC § 1291, as the district court's entry of judgment in favor of defendant, followed by its order denying Plaintiffs' motion for relief from judgment, was a final order that disposed of all of Plaintiff's claims in front of the district court.

**Timeliness:** The district court issued its Opinion and Order denying Plaintiffs' Motions for Relief from Judgment as well as his Motion for Attorneys' Fees on March 3o, 2023. Plaintiff timely filed her Notice of Appeal in the district court on April 27, 2023 (ECF No. 226).

## ISSUES PRESENTED FOR REVIEW

I.      Did the District Court err in granting Defendant City of Atlanta's Motion for Judgement as a Matter of Law relative to Plaintiff's claim of municipal liability after a well-instructed jury found Atlanta to be liable for $60 million in damages that resulted from that municipality's policies, practices, procedures and/or customs?

II.     Did the District Court err in denying Plaintiff's Motion for Relief from Judgment relative to his claim that the City of Atlanta was statutorily responsible for his medical bills, which arose at a time when he was in the custody of Atlanta?

III.    Did the District Court err in denying Plaintiff's Motion for Attorney Fees, which it stated that it would hold in abeyance pending the resolution of the appeals arising out of the subject trial?

## **STATEMENT OF THE CASE**

### **A. Introduction**

This cause of action arises out of an unconstitutional use of force toward Plaintiff Jerry Blasingame, an elderly homeless man suspected of panhandling in the City of Atlanta. Defendant Jon Grubbs Tasered Jerry in the back, without warning, while Jerry was standing on top of a hill. The subsequent fall down that hill left Jerry with a crushed skull and a broken neck, and rendered him a quadriparetic who will necessitate lifelong residential care.

As a result of the events to be described below, Plaintiff brought suit against Officer Grubbs and his employer, the City of Atlanta. Plaintiff alleged that the customs, policies and practices of the City of Atlanta were the driving force behind Grubbs's unconstitutional conduct and that each Defendant was liable pursuant to 42 U.S.C. § 1983. Following a two-week trial, the jury agreed and returned with a verdict totaling $100 million- $60 million of the verdict was in regard to the claim of municipal liability against Atlanta and $40 million was in regard to the claim of excessive force against Grubbs (which Grubbs has appealed in Case No. 22-13621). However, following trial, the District Court entered judgment in favor of the City of Atlanta, voiding that portion of the jury's verdict. As will be shown below, the evidence presented at trial fully supported the jury's verdict relative to the City of Atlanta. The District Court erred in concluding otherwise and must be reversed.

## B. The Underlying Use of Force

On the afternoon of July 10, 2018, Defendant Jon Grubbs and Keith Shelley were on patrol in the course of their employment with the Atlanta Police Department. Shelley was driving the police cruiser and Grubbs was in the passenger seat. The two were in the area of Atlanta where I-20, I-75 and I-85 converge. At the time of these events, traffic was generally heavy, or stop and go. As Officer Shelley described in his testimony, the two were not responding to any calls at the time. Instead, while patrolling and while in the process of parking their cruiser in a gore area of the highway, they observed Plaintiff Jerry Blasingame. (Tr, pp 827-828.) The area in question is known to have a large homeless population (Tr, p 912). Grubbs and Shelley each testified to regularly seeing the homeless and panhandlers in the general area where they saw Mr. Blasingame (Tr, pp 828-829, 912). The record established that at the time of these events, Mr. Blasingame was a homeless man who was 65 years old.

Mr. Blasingame was standing on the shoulder adjacent to the left-hand lane of the highway (Tr, p 888-889). Grubbs and Shelley did not make the same observations when they saw Mr. Blasingame. According to Shelley, he saw Mr. Blasingame allegedly on the roadway and receiving money from a motorist (Tr, p 832, 834-835). Grubbs, in contrast, testified that he never saw Mr. Blasingame on the roadway, never saw him approach any vehicle, interfere with traffic in any way

or receive any money from any motorist (Tr, p 1046)  Nonetheless, Grubbs testified that he did not know if Mr. Blasingame was panhandling and decided to approach him to question him (Tr, p 1048).  He was not planning on arresting Mr. Blasingame (Tr, p 1049).

When Grubbs exited the police cruiser, he had to walk across lanes of traffic in order to get to the area where Mr. Blasingame was standing (Tr, p 1048) (as will be discussed in extensive detail throughout this brief, Grubbs was equipped that day with a body worn camera.  However, there is no footage of these events as it has been proven that Grubbs turned off his camera during the encounter, which resulted in the footage of these events being erased).  As Grubbs was walking toward Mr. Blasingame, he testified that Mr. Blasingame began to run west (Tr, p 1048).  Grubbs testified that as Mr. Blasingame was running, he once again never entered the roadway (Tr, p 1050).  Instead, he was running along the shoulder of the road.  On one side of Mr. Blasingame was the yellow line at the edge of the highway; on the other side was a metal guardrail.

As he was running along the shoulder, Mr. Blasingame approached the metal guardrail.  In contrast to Mr. Blasingame, Defendant Grubbs was 29 years old on the day in question, was a trained police officer, a former high school track star who specialized in sprinting and he continues to regularly work out (Tr, p 904).  Unsurprisingly, Grubbs was able to quickly close the gap between him and the

5

elderly homeless man he was chasing. By the time Mr. Blasingame had made it to the guardrail, Grubbs stated that he was in 10 feet of Mr. Blasingame (Tr, p 1052). Though Grubbs testified that Mr. Blasingame was able to make it over that guardrail "very quickly," by the time that happened Grubbs had closed to within one foot of Mr. Blasingame. He stated that he was close enough that he could have touched him had he reached out. (Tr, pp 1053-1055, 1058.)

According to Grubbs, as Mr. Blasingame made it over the guardrail he swiped his arm back toward Grubbs, never making contact (Tr, p 1056). Grubbs testified that during the entire course of the events described here, Mr. Blasingame was not armed, did not act aggressively or threateningly and never said a word (Tr, pp 1065, 1069-1070) He stated that he was not in fear of Mr. Blasingame. Nonetheless, as Mr. Blasingame made it over the guardrail, Grubbs drew his Taser (Tr, p 1062). By this point in the events, Officer Shelley had lost sight of the two men and did not see what occurred (Tr, p 849).

When Mr. Blasingame crossed the guardrail, he entered a path that was in an area overgrown with shrubs, trees and other vegetation (Tr, p 1056). Importantly, there was a decline on the path that led downhill (Tr, p 536). Grubbs's testimony at trial left no doubt that he understood the nature of the terrain that Mr. Blasingame was now on:

> **Q.** You knew as you deployed, of course, that you were on an elevated surface; correct?

6

**A.** Yes.

**Q.** You knew he was running away from you; correct?

**A.** Yes.

**Q.** So and running downhill; right?

**A.** Yes. (Tr, p 1074)

According to Grubbs, without crossing over the guardrail that Mr. Blasingame crossed, he deployed his taser and the probes successfully entered Mr. Blasingame's back (Tr, pp 1071-1072). In contrast, Plaintiff introduced testimony from a police procedures expert who each testified that Grubbs *did* cross over that guardrail and proceed down a portion of the path before he fired his taser (Tr, pp 520-521). While Grubbs made it clear that Mr. Blasingame never posed a threat to him, he testified that he feared that Mr. Blasingame would run into traffic on an adjacent road if he continued to run. It was that alleged fear that served as the sole basis for the decision to deploy his Taser. Yet, Grubbs acknowledged at trial that he never saw Jerry enter any roadway that day. Further, he acknowledged that there was no evidence Mr. Blasingame ever would have done so:

**Q.** Officer Grubbs, in this case, you have no evidence that Jerry Blasingame would have run into the roadway, do you? Yes or no?

**A.** No. (Tr, p 1071)

When the 50,000 volts of electricity from the Taser entered Mr. Blasingame, he lost control of his muscles and fell forward. Because he and Grubbs were on elevated ground, he ultimately fell down the hill. At the bottom of the hill, there was a concrete platform supporting a traffic control box (Tr, p 538-539). Mr. Blasingame struck his head on that concrete platform. The result was catastrophic. Mr. Blasingame suffered fractures throughout his face and skull. The left side of his skull was crushed and pushed in toward his brain, causing a traumatic brain injury. (Tr, pp 1274-1277). The force of his head snapping back also caused his neck to break in the area of his C3-C5 vertebrae (Tr, p 1280). As a result of Grubbs's unannounced use of force, Mr. Blasingame was rendered a quadriparetic who, apart from certain minimal movements and spasms, is entirely paralyzed below the neck (Tr, p 1344).

The evidence at trial proved that Grubbs violated numerous policies and aspects of his training relative to the deployment of his Taser. Grubbs admitted at trial that he was trained to yell "Taser! Taser! Taser!" at a subject before firing his Taser. That warning is designed to provide a subject with an opportunity to comply or surrender before the Taser is used Grubbs fully admits, however, that he gave no such warning in this case. (Tr, p 1067.) In addition, Grubbs was trained to not use his Taser on the elderly or frail absent exigent circumstances. He was likewise

8

trained not to use his Taser on subjects who were running or who were on elevated ground. (Tr, pp 361, 365, 873-874.)

Michael Banja is a senior officer with the Atlanta Police Department and has been a certified Taser trainer since 2012 (Tr, p 308). Banja explained that when a Taser is successfully deployed, it delivers a charge of electricity for five seconds (Tr, p 335). That charge is intended to result in neuromuscular incapacitation that causes an uncontrolled fall. Because that fall is uncontrolled, the subject does not have an ability to brace or protect themselves. Consequently, even though a Taser is considered to be "less lethal" (as opposed to "less *than* lethal"), it can still be considered a deadly weapon (Tr, p 621). Thus, Banja testified that the Department's Standard Operating Procedures specifically provide that officers "shall not" use their Tasers on subjects that are actively running from officers, nor on the elderly or physically frail (Tr, p 384).

Atlanta's Standard Operating Procedures similarly provide that "Environmental factors which could lead to serious injury or death shall be taken into considerations" prior to deploying a Taser. (Tr, p 380) Consistent with that policy, officers are trained to consider the landing zone of subjects before using a Taser:

> **Q.** So in other words, you teach your officers like Officer Grubbs that folks can be seriously injured, or even die, depending on how they fall and, more importantly, how they land?

9

**A.** Yes.

**Q.** I take it you teach them to be cognizant of, again, where someone is going to fall?

**A.** When practical, we teach to be cognizant of where someone is going to fall. (Tr, p 370)

Grubbs admitted at trial that he was trained to predict landing zones and anticipate where someone may fall before using his Taser, and he testified that you do not want a subject falling in a landing zone you cannot see (Tr, p 927-928). Yet, he likewise testified that while he knew Mr. Blasingame was running downhill, he could not see what was at the bottom of that decline and was thus unaware of the metal box on which Mr. Blasingame landed (Tr, p 1089).

Plaintiff's two police procedures experts, Dr. Andrew Scott and Thomas Tiderington, also each testified regarding the use of force. As Mr. Tiderington opined, Grubbs did not have probable cause to arrest Mr. Blasingame as he did not see him commit any crime (Tr, p 1125). Thus, when Mr. Blasingame began to run, Grubbs did not have justification to utilize his Taser as Mr. Blasingame was within his right to leave (Tr, pp 1126-1127). Dr. Scott agreed (Tr, p 459). Further, each expert explained that Grubbs violated numerous policies relating to tasing Mr. Blasingame while he was elderly, running, on elevated ground and where Grubbs did not have knowledge of the landing zone (Tr, pp 516-517, 1147-1148). They left

10

no doubt that the force used in this case, under these circumstances, amounted to deadly force that was constitutionally prohibited (Tr, pp 622, 1147-1148).

As is stated above, the injuries to Mr. Blasingame were catastrophic. He was taken via ambulance from the scene to Grady Hospital in Atlanta. While at Grady, he was considered to be in detention and in the custody of the City of Atlanta. Officer Grubbs testified that Mr. Blasingame was in custody the moment that the taser prongs entered his back (Tr, p 1079-1080). Atlanta further demonstrated that Mr. Blasingame was in custody by serving him with two different citations in September 2018, while he was in Grady Hospital, which stated that Mr. Blasingame was currently located in "Grady Detention." (Tr, p 558).

Mr. Blasingame currently resides in a residential facility known as Safehaven in Georgia (Tr, p 1294). He suffers from quadriparesis and has very little movement below his neck. He has a tracheotomy tube in his neck to enable him to breathe (Tr, p 1205), a feeding tube inserted through his abdomen to enable him to eat (Tr, p 1207), a catheter that passes through his abdomen into his bladder (Tr, p 1209), and he is required to wear diapers (Tr, p 1211). Testimony at trial overwhelmingly established that Mr. Blasingame continues to feel pain each and every day and that his conditions are very unlikely to improve in any meaningful way (Tr, pp 1233-1234). He will be dependent on others for the remainder of his life. Unrebutted testimony at trial established that Mr. Blasingame, at the time of trial, had incurred

11

roughly $4.2 million in medical expenses thus far with a projection of an additional 16,861,652 in future medical expenses (Tr, pp 1425, 1433).

### C. The Significance of the Body Worn Camera Policy Violations

Just as the record shows that Grubbs did not comply with his training relative to the use of his Taser, so too does it show that he violated policy and training relative to his body worn camera. The camera Grubbs was wearing that day had a toggle switch that controlled whether the camera was powered on or off. If the camera was toggled off, it was not functional. When the camera was toggled to the on position, it would operate in what is known as buffering mode. While in buffering mode, the camera records constantly. However, it records over the previously recorded footage every two minutes. (Tr, pp 172-176.)

The camera also features what is known as an event button, which is a separate button that gets pressed instead of toggled. When a camera is on and in buffering mode, pressing the event button twice activates recording mode. In that mode, the footage records until the event button is pressed again and does not record over the footage that had been recorded in buffer mode. In fact, by pressing the event button twice, the two minutes of footage that had been recorded in buffer mode is maintained and forms the beginning of the available video footage. Lastly, and of much importance, if an officer's camera is in buffering mode and then the camera is toggled off, the footage that had been recorded in buffer mode is deleted. (Tr, pp

12

175-179.) Numerous employees of the Atlanta Police Department testified that Grubbs had been trained that toggling his camera to the off position would delete the footage that had been stored in buffering mode. Grubbs and Shelley each testified that they never received any such training on that fact. (Tr, pp 822, 915.)

Atlanta police officers are required to keep their cameras toggled on and in buffering mode at all times. When an officer begins to interact with a member of the public or anticipates an interaction, they are trained to hit the event button twice to begin recording. When that event ends, they may hit the event button again and return to buffer mode. It appears that there are no scenarios in which officers are trained that it is appropriate to turn their cameras off. (Tr, pp 187, 189.)

Initially, Officer Grubbs claimed in this case that he went to the bathroom at the beginning of his shift and that he toggled his camera off at that time. He claimed that he did not remember to turn his camera back on and that it therefore was off at the time of the encounter with Mr. Blasingame and did not capture any of the events described above. The record, however, conclusively shows otherwise.

Plaintiff introduced into evidence an audit trail of Grubbs's body cam, which documented exactly how Grubbs used his camera on the day in question. Julio Reyes, Jr. has worked in the Atlanta Police Department for over 24 years and trains the department's officers on how to use their cameras (Tr, pp 146-147). He was designated as the person most knowledgeable from the City of Atlanta regarding the

body worn camera program (Tr, 156). Examining that audit trail, he testified that Grubbs did indeed turn his camera off at 12:35 p.m., toward the beginning of his shift, presumably when he was in the bathroom (even though officers are trained not to even turn their cameras off in that scenario). (Tr, pp 238, 244-245). However, contrary to what Grubbs claimed, he then turned his camera back on at 12:40 p.m. (Tr, p 248.) Grubbs's camera was on and in buffering mode when he first saw Mr. Blasingame. However, at 2:36 p.m., Grubbs toggled his camera *off*. (Tr, p 252.) It was not turned back on until after Mr. Blasingame was face down at the base of the hill with a broken neck and a crushed skull. Reyes agreed, relative to the body camera, that it was not even a close call that Grubbs violated Atlanta's policies and his training when he toggled his camera off during these events (Tr, p 181). When asked whether a violation of the body camera policies was a minor matter, he stated:

> No. All of the policies are -- are important. They're there for a purpose, and they have to be followed accordingly. My approach as a trainer is, there is no one policy that is more important than another. They're all important. And they're all of our responsibility to make sure that we're knowledgeable of them and follow them. And that's what we're responsible [sic] for when we sign off on the policies. [Tr, p 160].

Plaintiff's police procedures expert, Dr. Andrew Scott, testified that the encounter with Mr. Blasingame began at roughly 2:36 p.m. He explained that the entirety of the encounter, from when Grubbs began to approach Mr. Blasingame until the time he used his Taser on him, took less than two minutes. According to Dr. Scott, Grubbs has his camera on and in buffer mode at the beginning of the

encounter. Then, *after* Grubbs used his Taser on Mr. Blasingame, he toggled his camera off, which destroyed the footage of the encounter that would have been stored in buffer mode. (Tr, pp 468-471.) Had Grubbs hit the event button instead of toggling his camera off, as policy required, that footage would have been recorded and maintained.

Multiple witnesses in this case (including Grubbs (TR, p 1076) and Reyes (Tr, p 164)) agreed that the evidence captured by the body camera would have been the best evidence in this case, had it not been destroyed. When asked if that evidence would have been the best evidence of what occurred here, Dr. Scott responded "Without a doubt. That's why Atlanta Police Department and so many other agencies in the United States are using body-worn cameras, because they reflect an unbiased opinion, so to speak, of what transpired." (Tr, p 471)

When considering the circumstances of this case, it calls to question whether Grubbs was intentionally covering up his conduct. Reyes testified that it was possible that Grubbs intentionally turned off the camera to delete evidence (Tr, p 181). He testified that had he been in charge of this investigation, he would have looked into Grubbs's past use of his body camera to determine whether he had a pattern of turning his camera off, but he was not asked to do that by Atlanta (Tr, p 164). He agreed that if Grubbs intentionally destroyed this evidence, it was

potentially a criminal act and if Atlanta truly wanted to ascertain the truth of Grubbs's account, that evidence should have been looked into. (Tr, pp 183-184.)

Plaintiff's two police procedures experts both agreed with Reyes regarding the significance of Grubbs's destruction of evidence (Defendants offered no expert testimony in this case, leaving the evidence of Plaintiff's highly qualified experts unrebutted. Defendants likewise offered no damage witnesses). Dr. Scott testified that "the camera should have never been turned off. That -- it leads me to believe that Officer Grubbs intentionally turned the camera off and subsequently erased the buffering, which would have captured the initial contact with Mr. Blasingame and the subsequent foot pursuit and tasing." (Tr, p 581) Plaintiff also had a second police procedures expert, Thomas Tiderington, who testified that

> My conclusion was that the camera was intentionally turned off to erase the event that occurred on this particular day, and then it was turned back on. And, in fact, it happened twice. It happened during the initial encounter with Mr. Blasingame, and then it happened a second time right after Mr. Grubbs asked to use his partner, Officer Shelley's cell phone to make a phone call to his supervisor, he turned the camera off a second time, in my opinion, intentionally turned the camera off a second time. [Tr, p 1118]

Dr. Scott and Mr. Tiderington (as well as other witnesses) each explained the importance of complying with body camera policies. For context, however, it is essential to understand the deep failings within this department regarding body cameras. The City of Atlanta performed a department wide audit on body cam usage from November 2017 until May 2018. It issued a report on that audit in December

2018. (Tr, p 266.) That report, admitted as Trial Exhibit 38, addressed officers'

compliance with body cam policies up until two months prior to the events of this

case (Tr, pp 267-268). When asked about the audit results, Reyes testified as follows:

> **A.** I can't recall an actual percentage number, but I do recall that the audit findings, their data reported that usage as far as how activation, when the officers are supposed to start their recordings was lower than acceptable.

***

> **Q.** Thank you. In that first paragraph, officers assigned body-worn cameras captured video for 33 percent of officer dispatch calls occurring from November 27 -- excuse me, November 2017 through May 2018. Did I read that right?

> **A.** Yes, sir.

> **Q.** Police department staff told us they would expect 80 percent of all incidents to have corresponding video. Did I read that right?

> **A.** Yes, sir.

> **Q.** So 33 percent, folks were using it; is that right?

> **A.** Yes, sir.

> **Q.** Which means 67 percent of folks, officers, did not?

> **A.** Yes, sir. (Tr, pp 269-270)

Reyes then agreed that 2/3 of officers not following department policy shows a

pattern (Tr, p 276). He likewise agreed there is a practice of not following

department policy regarding body cameras (Tr, p 276). Further, he agreed there was

17

a custom of officers not using the event button properly and said he was not aware of them being disciplined (Tr, pp 290-291).

Plaintiffs' experts made the significance of the customary body camera policy violations clear. When asked how to explain why the department never looked into why Grubbs lied about his body camera being off, Dr. Scott stated that "I believe that there may be a culture within the organization that intentionally overlooks or dismisses some of the most obvious and blatant policy violations, and as a result, ignore it." (Tr, p 584). When asked if that failure to investigate was an innocent oversight, Dr. Scott said that it couldn't be: "I think there is a pattern and practice within the agency that allows this to occur." (Tr, p 585). Then, the following exchange occurred:

> **Q.** Do you have an opinion as to whether that indifference of a pattern and practice directly led to this very event?
>
> **A.** Yes.
>
> **Q.** What is your opinion on that?
>
> **A.** Yes. That indifference led to this type of behavior, and further leads to additional types of behavior similarly, because no one's held accountable and management is not doing what they need to do to hold people accountable.
>
> **Q.** How can, in your estimation, this indifference, in pattern and practice, have led to this event, sir?
>
> **A.** Well, a pattern and practice or indifference is generated over a myriad of years. It becomes part of the agency culture not to hold its members accountable and not fully investigating cases of this nature.

> And then what happens with that is, it compromises the trustworthiness of the police department to the public. And it occurs over many, many years, and it becomes just a custom. [Tr, p 586]

When asked how a failure to enforce body worn camera policies relates to use of force against the public, Dr. Scott testified

> So if you're not holding your officers accountable, particularly on the most highest duty that an officer is allowed to perform, meaning use of force, then the officers, not only just the officer that is in question, but the officers throughout the rank and file, recognize that there is no consequence to their actions. So if there is no consequences and they're not being held accountable, that means then officers can go off the rail and do what they think they should do when it's not comporting or complying with the agency's policy. It's a very bad formula for disaster to the general public of not adequately keeping your officers accountable for their actions. (Tr, pp 587-588)

Like Dr. Scott, Mr. Tiderington, who has 44 years of law enforcement experience, including 20 years as a chief of police, opined that there was a direct connection between enforcement of body worn camera policies and use of force.

> **A.** There is an absolute connection between the body-worn cameras and the use of force by police officers, in my opinion.

> **Q.** How?

> **A.** It's my experience -- well, first of all, we have to kind of explain what the purpose is of the body-worn cameras, and the purpose of the body-worn cameras is to -- one of the main purposes is to exonerate our police officers who are being accused of misconduct. So oftentimes commanders, police chiefs, we want to view the video to prove that our officer acted properly. And to exonerate any type of false allegation made against our officers. It's my experience that many, many good officers want every second of the event captured on video so they can prove what they did was -- was proper. So they go out of their way to

19

make sure that the camera is actually videotaping properly, videotaping the events that are occurring there.

**Q.** Okay. And how is that then connected, the camera itself and use of force, Mr. Tiderington?

**A.** As far as how it is connected to the use of force, it's been my experience that the -- once we deploy body-worn cameras at least in my departments and other departments that I'm familiar with, it has reduced the number of citizen complaints made against our officers, and it also has reduced the incidents of use of force that departments experience prior to deploying the cameras. [Tr, pp 1118-1119.]

Then, similarly,

**Q.** Does the use of on-body cameras, if utilized appropriately, can it prevent, if you will, excessive force?

**A.** I believe they do prevent excessive force. (Tr, p 1120)

Mr. Tiderington then explained that it was

very disappointing to see the non-compliance on behalf of a large number of officers within the police department that failed to utilize the cameras appropriately. I think the number was somewhere, somewhere -- to me it was shocking of all of the events captured, only -- of all of the events that occurred, only 60 -- I'm sorry, 30 to 40 percent of the incidents were captured on video, which means 70 percent of the time the officers were not properly, according to policy, utilizing the tools that were provided to them by the City of Atlanta at a great expense to the City of Atlanta. (Tr, p 1122)

### D. Relevant Procedural History

The trial in this matter began on August 17, 2022, and concluded on August

26, 2022.  At the close of trial, the jury returned with a verdict totaling $100 million

in Plaintiff's favor- $60 million was attributed to Atlanta and $40 million to Grubbs

20

(ECF No. 163).  Thereafter, both Defendants brought motions for judgment as a matter of law (ECF No. 155), which Plaintiff opposed (ECF Nos. 168 and 169).

On September 14, 2022, the District Court issued its order denying the motion for JMOL by Grubbs, but granting the motion on behalf of Atlanta.  The Court directed the clerk to enter judgment in favor of Atlanta and judgment against Grubbs for the amount reflected in the jury verdict.  (ECF No. 177).  The Court held that the evidence presented at trial did not satisfy the applicable requirements for a claim of municipal liability.

On October 6, 2022, Plaintiff brought a Motion for Attorney Fees as the prevailing party (ECF No. 186). Further, Plaintiff filed his motion for relief from order on October 12, 2022, in which Plaintiff asserted that the jury's verdict relative to municipal liability was consistent with the law and the evidence presented at trial (ECF No. 187).  Similarly, on October 20, 2022, Plaintiff filed his motion for relief from order in which he asserted that he was statutorily entitled to payment of certain medical bills by Atlanta, which were not accounted for by the judgment. (ECF No. 191).

On March 30, 2023, the District Court entered its order denying Plaintiff's motions for relief from order and Plaintiff's motion for attorney fees (ECF No. 219). Thereafter, on April 27, 2023, Plaintiff timely filed his notice of appeal (ECF No. 226).

21

At the time of this writing, the City of Atlanta is asserting that it will not indemnify Officer Grubbs, despite not disciplining him for this use of force and despite the fact that he is still employed by the Department. Plaintiff asserted at trial that the City should be obligated to indemnify Grubbs where the same attorneys defended both Grubbs and the City at trial, which the District Court opined was a conflict of interest because those attorneys were taking positions for the City that were contrary to Grubbs's interest (Tr, p 1020). In other words, with the judgment against the City vacated, Mr. Blasingame faces a future where he will potentially recover nothing despite the jury awarding him $100 million dollars and despite the fact that he has incurred millions of dollars in medical bills and a lifetime of suffering.

## STANDARD OF REVIEW

As this Court has previously stated, "[w]e review *de novo* the district court's rulings on motions under Rule 50 of the Federal Rules of Civil Procedure, examining the trial evidence in the light most favorable to the non-moving party." *Doe v Celebrity Cruises, Inc*, 394 F3d 891, 902 (CA 11, 2004).

## SUMMARY OF ARGUMENT

The District Court erred in granting the City of Atlanta's Motion for Judgment as a Matter of Law. During trial, Defendant's own employees admitted that there was a policy, practice or custom in the department of officers not properly recording

events on their body cameras. The City's own audit of its officers showed that in 2/3 of encounters with the public, officers were not recording their interactions. Defendant's own employees then testified that they were unaware of any employees being disciplined for those violations.

Plaintiff introduced the testimony of two highly qualified police procedures experts who have each served as chiefs of police and each been responsible for internal affairs departments. Both of those experts testified that there was a de facto policy of not enforcing body camera policies in Atlanta and that there was a direct connection between that de facto policy and uses of force. When officers know that they can get away with not recording interactions with the public, or even deleting those interactions after they occur, they are aware that they can eliminate evidence of uses of force without ramification. That is precisely what occurred here, and the precedent of the United States Supreme Court and the Eleventh Circuit each provide for liability under these circumstances.

The District Court also erred in holding that Atlanta was not responsible for Plaintiffs medical bills pursuant to O.C.G.A. § 42-5-2. Pursuant to that authority, Defendant is obligated to pay for the medical care of individuals who are in Defendant's custody. The evidence at trial established that the moment Grubbs tased Mr. Blasingame, Mr. Blasingame was in custody. He remained in custody when he was taken to Grandy Hospital, which has a portion that is utilized for those in

detention or custody.

Finally, the District Court erred in denying Plaintiff's motion for attorney fees. The District Court did not deny that motion for substantive reasons, as it determined that Plaintiff was the prevailing party. However, the Court stated that it was deferring its final ruling on attorney fees until after the appeals in this matter were complete and noting that Plaintiff would have a right to renew that motion at a later time. Because that order was not entered separately from the order from which Plaintiff now appeals, Plaintiff maintains his entitlement to the claimed fees in order to properly preserve that claim.

## **ARGUMENT**

## I. **The District Court erred in granting Defendant's Motion for Judgment as a Matter of Law as it relates to Plaintiff's claim of municipal liability**

In the response to Defendants' renewed motion for judgment as a matter of law, Plaintiff argued that Defendants' documented and admitted failures to enforce its body camera policies was the driving force behind the constitutional violation at issue in this case.

Turning to the controlling authority, the question before this Court relates to the propriety of municipal liability pursuant to 42 U.S.C. 1983. Such liability is commonly referred to as *Monell* liability. In *Monell*, the United States Supreme Court determined that, contrary to its prior decision in *Monroe v. Pape*, 365 U.S.

167 (1961), local governments are properly classified as "persons" under 42 U.S.C. 1983 and thus are amenable to suit under that legislation.  In explaining when such suits are proper, the Court stated as follows:

> Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers. Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decision making channels.  [*Monell*, 436 U.S. at 690.691.]

Addressing why a municipality could be held liable for its customs and not just its officially adopted policies, the Court quoted Justice Harlan's words in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-168 (1970): "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."

While the *Monell* Court recognized that a municipality could be held liable for injuries resulting from violations of constitutional rights, it emphasized that such liability *was not* synonymous with *respondeat superior* liability and that

municipalities were not liable merely because they employed someone who proved to be a tortfeasor.  Ultimately, the Court found that the case before it "unquestionably involves official policy as the moving force of the constitutional violation found by the District Court, see supra at 660-662, and n. 2, we must reverse the judgment below." *Monell*, 436 U.S. at 694-695.  Yet the Court recognized that future decisions would inevitably have to expound on the scope and margins of such liability, saying "we have no occasion to address, and do not address, what the full contours of municipal liability under § 1983 may be. We have attempted only to sketch so much of the § 1983 cause of action against a local government as is apparent from the history of the 1871 Act and our prior cases, and we expressly leave further development of this action to another day." *Id*. at 695.

Eleven years after *Monell* was decided, the Supreme Court had further opportunity to explain the contours of municipal liability.  In *City of Canton v. Harris*, 489 U.S. 378, 380 (1989), the Supreme Court described the issue it faced thusly: "In this case, we are asked to determine if a municipality can ever be liable under 42 U. S. C. § 1983 for constitutional violations resulting from its failure to train municipal employees. We hold that, under certain circumstances, such liability is permitted by the statute."  As will be shown below, the present case falls squarely within the holding in *City of Canton*

In *City of Canton*, the Plaintiff was arrested and brought to the Canton Police

26

Department via a patrol wagon.  When officers arrived at the station, they discovered that the Plaintiff was sitting on the floor of the wagon and was seemingly incoherent. After taking her into the station, she "slumped to the floor on two occasions." Officers never sought medical attention for the Plaintiff, who was released from custody after approximately one hour. Thereafter, her family had her transported to the hospital where she was diagnosed with emotional conditions that resulted in a week's hospitalization and a year of outpatient treatment.  *Id*. at 381.

The Plaintiff in *City of Canton* brought suit and alleged that the municipality was liable for the failure to provide her with necessary medical care.  Specifically, the Plaintiff asserted that the municipality had a policy by which the shift commanders in the station had exclusive authority to decide whether a prisoner required medical care and that because those shift commanders did not have inadequate training, unconstitutional deprivation of medical care necessarily resulted.  *Id*. at 382.

In affirming that the municipal defendant could be held liable for its failure to train in *City of Canton*, the Supreme Court explained several points that are crucial to the present action.  First, in recognizing the viability of a "failure to train" theory, the Court stated that "[f]or reasons explained below, we conclude, as have all the Courts of Appeals that have addressed this issue, there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983.

27

Thus, we reject petitioner's [the City of Canton] contention that only unconstitutional policies are actionable under the statute." *Id*. at 387. Consequently, for the purposes of this case, Plaintiff need not show that the City of Atlanta had any policy that was, itself, unconstitutional. To the contrary, Plaintiff only needed to show that a policy or custom was the driving force of the unconstitutional act committed by Officer Grubbs.

Next, the Supreme Court explained that where a Plaintiff proceeds on a theory of failure to train, he must demonstrate that the failure to train was motivated by deliberate or conscious indifference of the municipal defendant. The Court stated that "[o]nly where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality -- a 'policy' as defined by our prior cases -- can a city be liable for such a failure under § 1983." *Id*. at 389. "To establish a city's deliberate indifference, 'a plaintiff must present some evidence [such as the audit evidence and testimony in this case] that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'" *Lewis v City of West Palm Beach*, 561 F.3d 1288, 1293 (quoting *Gold*, 151 F.3d at 1351-52).

After explaining a municipality can be held liable for its deliberate failure to train employees, the Court turned to the type of causal connection that had to be shown for liability to attach. The Court noted "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the

officer's shortcomings may have resulted from factors other than a faulty training program." Id. at 391. Thus, "for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." Id. at 391.

Lest there is any doubt, the Supreme Court also made it clear that the causal determination is generally a question of fact:

> Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect? Predicting how a hypothetically well-trained officer would have acted under the circumstances may not be an easy task for the factfinder, particularly since matters of judgment may be involved, and since officers who are well trained are not free from error and perhaps might react very much like the untrained officer in similar circumstances. But judge and jury, doing their respective jobs, will be adequate to the task. [Id. at 391.]

Taken in combination, *City of Canton* demonstrates that if a jury finds that a municipality's 1.) failure to train is 2.) the product of deliberate indifference and 3.) is closely related to the ultimate injury caused by a constitutional violation, municipal liability under 42 U.S.C. 1983 is appropriate. And, contrary to Defendants' position in their motion, nothing in subsequent decisions from the 11th Circuit materially changes that analysis.

The 11th Circuit has acknowledged that "[t]he Supreme Court has instructed that these 'limited circumstances' occur only where the municipality inadequately trains or supervises its employees, this failure to train or supervise is a city policy,

and that city policy causes the employees to violate a citizen's constitutional rights." *Gold v City of Miami*, 151 F3d 1346, 1350 (11th Cir., 1998).

In holding that Defendants were entitled to judgment as a matter of law on this point, the Court stated that "while Plaintiff's experts gave broad, conclusory opinions that proper use of BWCs can reduce uses of excessive force, Plaintiff did not show that the APD's failings regarding BWC usage increased uses of excessive force.  Thus, even if Plaintiff showed a persistent failure to comply with or enforce the APD's BWC policies, that failure was not shown to have resulted in a widespread use of excessive force."  The Court then referenced one of the two jury instructions provided before jury deliberations, which discussed the need to show at least one prior, similar use of unconstitutional force.  The Court stated that "[a]t the very least, the jury's verdict was not supported by evidence concerning" a prior constitutional violation.

At the close of trial, the jury was provided with two different instructions regarding municipal liability. The District Court's order granting Defendant's renewed motion focused on the second of those two instructions, which relates to a failure to train theory of liability. But, the Court's order does not reflect that it likewise considered the first instruction, which provided:

> Plaintiff also claims that the City of Atlanta, which employed Defendant Jon Grubbs, is liable for violating Jerry Blasingame's constitutional rights.  You should consider whether City of Atlanta is liable only if you find that Defendant Officer Grubbs violated Jerry

30

Blasingame's constitutional rights.

City of Atlanta is not liable for violating Jerry Blasingame's constitutional rights simply because it employed Defendant Officer Grubbs. Rather, City of Atlanta is liable if Plaintiff proves that an official policy or custom of City of Atlanta directly caused his injuries. Put another way, City of Atlanta is liable if its official policy or custom was the moving force behind Jerry Blasingame's injuries.

An "official policy or custom" means:

1.  A rule or regulation created, adopted or ratified by the City of Atlanta; or

2.  A policy statement or decision made by the City of Atlanta's policymaker; or

3.  A practice or course of conduct that is so widespread that it has acquired the force of law- even if the practice has not been formally approved.

Again, upon the agreement of the parties, the Court instructed the jury that, "City of Atlanta is liable if its official policy or custom was the moving force behind Jerry Blasingame's injuries." As the Court acknowledged, Plaintiff presented evidence to demonstrate the existence of an official policy or custom and introduced evidence that said official policy or custom was the driving force behind the unconstitutional use of force in this case. Nothing more was required, including any showing regarding a history of constitutional violations.

The jury instruction that did not require the Plaintiff to prove a prior, similar violation, and the verdict form that did not ask the jury whether there was a prior, similar violation, were both fully consistent with the controlling authority (thus

31

explaining why Defendants did not object to their use). The Eleventh Circuit has stated that "[w]e have noted that a single constitutional violation may result in municipal liability when there is 'sufficient independent proof that the moving force of the violation was a municipal policy or custom.'" *Vineyard v. Co of Murray*, 990 F.2d 1207, 1212 (11th Cir., 1993), quoting *Gilmere v. City of Atlanta*, 774 F.2d 1495, 1504 n. 10 (11th Cir.1985), cert. denied, 476 U.S. 1115 (1986). That recognition was a necessity, as the United States Supreme Court has stated that "In *Canton* [*v. Harris*, 489 U.S. 378 (1989)], the Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Connick v Thompson*, 563 U.S. 51, 63; 131 S Ct 1350; 179 L Ed 2d 417, 428 (2011).

In granting Defendants' renewed motion, the Court also expressed concern that Plaintiff only produced one opinion in which a court accepted the theory that a failure to enforce BWC policies could be a moving force behind an unconstitutional use of force. Respectfully, there is no obligation to show other actions that have prevailed on a similar theory. Instead, Plaintiff was merely obligated to show that a custom or policy by *this* municipal defendant was the moving force behind *this* constitutional violation. Again, if Plaintiff merely offered unsupported arguments to the jury that asked them to conclude, on the basis of no actual testimony, that there was a causal link in this case, the novelty of the theory would certainly be a relevant

32

consideration for the Court.    Instead, this Plaintiff offered unrebutted expert testimony explaining exactly how the City's admitted failings on BWC enforcement inevitably led to the specific constitutional violation in this case.

And while neither *Monell* nor its progeny require a similar theory of municipal liability to have been previously advanced elsewhere, the increased availability of BWCs is resulting in courts acknowledging the sound logic of the theory in this case. In *Epps v City of Denver*, 2022 U.S. Dist. LEXIS 35895 (March 1, 2022), the Court denied a motion for summary judgment on a municipal liability claim where Plaintiff's experts opined in their reports that a preexisting policy of not enforcing body camera usage was a driving force of a subsequent use of excessive force.    The Court explained that "Defendants misunderstand the application of plaintiffs' evidence. Plaintiffs argue that Denver's failure to require use of force reports and body worn camera activation, a preexisting policy understood by officers before the protests, notified officers that they likely would not be held accountable for excessive uses of force and thus caused them to use excessive force. Plaintiffs have presented sufficient evidence to support this causal claim."

Similarly, the District Court in *Jones v Louisville/Jefferson County Metro Gov't*, 482 F.Supp.3d 584 (2020) also recognized the sound logic behind the theory advanced here.    In denying a pre-discovery motion to dismiss, the Court explained that

33

> Here, it is plausible to infer that un-filmed officers may act differently than those who are under surveillance. True, there will be times when officers with cameras use excessive force, just as there will be times when officers without body cameras do not use excessive force. But it's plausible to infer that a city-wide decrease in body camera usage will result in a city-wide increase, to some degree, in incidents of excessive force. This claim is bolstered by the pleaded fact, which this Court must accept as true, that officers confiscated and destroyed Plaintiffs' surveillance footage of the raid in question.

The Court then stated that "the plaintiffs may lose on this *Monell* claim — on custom, on causation, or on both. But at the motion to dismiss stage, Plaintiffs have plausibly pleaded that Louisville Metro has a custom of not having officers wear or activate body cameras and that this custom caused their injuries. This claim may proceed."

Thus, while the District Court may have considered Plaintiff's municipal liability theory to be novel, other district courts (without requiring a previous similar decision) have acknowledged that if the evidence ultimately shows that a lack of enforcement of BWC policies was the moving force behind a use of excessive force, liability is proper under *Monell*. *Jones* is of even greater relevance because it notes that the theory in the case was buttressed by the fact that the officers, in addition to not using their body cameras, destroyed what footage of their conduct that did exist. The same is true hereWhen considering the other inaccuracies and inconsistencies within Grubbs's account of these events, there was every reason to believe that this is an officer who is enabled by the City's dereliction in enforcing the policies it

enacted to protect the public, which is exactly what Plaintiff's experts opined.

While the Plaintiffs in *Epps* and *Jones* were not at the trial stage when the above-described opinions were issued, those Courts recognized that if the proofs substantiated the allegations in the complaint, municipal liability would be proper. Whether any other Plaintiff has successfully made that showing at trial before is irrelevant to the fact that this Plaintiff, in this trial, *did* make that showing. Defendant did nothing whatsoever in trial to rebut the overwhelming evidence presented to the jury. The only aspect of Plaintiff's claim that appears to be disputed is whether there was a causal connection between the custom at issue and the underlying violation. Defendants' own 30(b)(6) witness, Julio Reyes, testified that there was a custom of not enforcing body camera policies. The City is bound by that admission. And the audit report introduced at trial leaves no question that the City was aware of the failure to abide by the BWC policies and did nothing to remedy those failures.

All that was left in light of the overwhelming evidence relating to custom or policy was the showing of causation. Plaintiff undoubtedly produced expert testimony regarding that element. Dr. Andrew Scott, who is a Doctor of Criminal Justice with more than 30 years of law enforcement experience that includes being a chief of police and a head of internal affairs, testified that the audit demonstrates that the City had a pattern, practice and custom of not training and supervising its

officers' use of their body cameras and that the City's failure in those regards was the product of deliberate indifference. He explained that in such an environment, officers understood that there were no consequences in failing to comply with the body camera policy. Finally, he testified that the City's failure to train and supervise relative to body cameras directly led to the use of force against Mr. Blasingame.

In addition to Dr. Scott, Plaintiff presented the testimony of Police Chief Tom Tiderington, a highly experienced and qualified expert with more than 40 years of law enforcement experience. Chief Tiderington likewise testified that the audit evidence demonstrates that the City has a de facto policy of not supervising and training its officers on proper body cam use. He explained that where such a policy exists, the consequence is an increased likelihood that officers will use excessive and unconstitutional force. He stated that where a municipality freely permits officers to not abide by body camera policy, that municipality is training the officers to use whatever level of force they desire. He also testified that in Departments where body cameras are instituted and utilized, incidents of use of force decrease.

Plaintiff states this as respectfully as possible, but in light of the above testimony, the District Court's conclusion that Plaintiff did not adequately make a causal connection between the custom/policy and the use of excessive force amounts to an improper determination that Dr. Scott and Chief Tiderington are simply incorrect, or that their opinions are not credible (despite being completely unrebutted) It is a

substitution of judgment. "When the resolution of the case boils down to credibility, the trial judge must allow the jury to function." *Hewitt v. B.F. Goodrich Co.*, 732 F.2d 1554, 1558 (11th Cir. 1984). Dr. Scott and Chief Tiderington each have exceptional amounts of experience with directly supervising officers. If they unambiguously opined that there was a causal connection between this specific custom in Atlanta and this specific use of force, this jury was permitted to deem their testimony credible and reach the verdict it did.

## II.    The District Court erred in denying Plaintiff's Motion for Relief from Judgment relative to his claim under O.C.G.A. § 42-5-2

Just as the District Court erred in concluding that Defendant was entitled to judgment as a matter of law relative to the claim of municipal liability, it likewise erred in concluding that Defendant was not statutorily responsible for Plaintiff's medical bills. Georgia law provides that the responsible governmental entity shall pay for the necessary medical expenses of inmates in their custody. *See* O.C.G.A. § 42-5-2.

> "Except as provided in subsection (b) of this Code section, <u>it shall be the responsibility of the governmental unit, subdivision, or agency having the physical custody of an inmate to maintain the inmate, furnishing him food, clothing, and any needed medical and hospital attention</u>; to defend any habeas corpus or other proceedings instituted by or on behalf of the inmate; and to bear all expenses relative to any escape and recapture, including the expenses of extradition.
>
> …

37

Except as provided in subsection (b) of this Code section, <u>the department shall also bear the costs of any reasonable and necessary follow-up medical or hospital care rendered to any such inmate as a result of the initial emergency care and treatment of the inmate</u>."

### a. Mr. Blasingame Was Injured in the Custody of Atlanta Police Department

The Georgia Court of Appeals has explicitly held that "when officers subdue a subject, render first aid, and transport him to the hospital, physical custody is shown." *Macon-Bibb County Hosp. Auth. v. Reece*, 228 Ga. App. 532, 534 (1997) (citing *Cherokee County v. N. Cobb Surgical Assocs., P.C.*, 221 Ga. App. 496, 497-498 (1996)).

In *Cobb*, the individual "was shot and incapacitated by one Cherokee County deputy, placed in restraints by another, and taken in restraints to the hospital in a county vehicle that was escorted by a sheriff's department vehicle. This was sufficient to place [the individual] in the physical custody of the deputies." 221 Ga. App. at 498.

Here, Defendant Grubbs tased Mr. Blasingame in the back when detaining him. Defendant Grubbs testified that Mr. Blasingame was in custody beginning the moment he was tasered. He testified that had Mr. Blasingame not been injured, he would have been arrested and taken to jail. (1079-1080.) His partner, Officer Shelley, likewise testified that Mr. Blasingame was in custody while he was in Grady Hospital. Indeed, while Mr. Blasingame was still at the hospital two months after

38

this incident, he was served with two citations that each referenced that he was in detention at Grady Hospital, which apparently contains a section for those who are inmates or detained (558-559).

Like *Cobb*, Mr. Blasingame was injured by an officer, Defendant Grubbs, while the officer was detaining or arresting Mr. Blasingame. Defendant Grubbs called for EMS and monitored Mr. Blasingame until Mr. Blasingame was transferred to the hospital where Mr. Blasingame remained in police custody. Accordingly, Mr. Blasingame was in custody when he was injured and thus meets this statutory requirement, and is therefore payment of past and present medical expenses incurred for injuries sustained while he was in the custody of City of Atlanta and Atlanta Police Department.

### b. Mr. Blasingame Qualifies as An Inmate under O.C.G.A. § 42-5-2.

The Georgia Court of Appeals has long held that the term "inmate" as used in O.C.G.A. § 42-5-2 applies "not only [to] a person who has been convicted of an offense, but also a person who is detained by reason of being charged with a crime." *Macon-Bibb Cty. Hosp. Auth. v. Hous. Cty.*, 207 Ga. App. 530, 531-532 (1993).

As explained by a court in this federal district, "Georgia courts have held that pretrial detainees who are in custody by reason of having been charged with a crime qualify as 'inmates' for purposes of § 42-5-2, even if the detainee is released on his own recognizance while in the hospital. Those who would have been placed into

custody but for their injuries have also been held to qualify as 'inmates,' though they were not yet detained in a detention facility." *Saylor v. Barrow County*, 2010 U.S. Dist. LEXIS 154614, at *13 (N.D. Ga. Mar. 9, 2010) (internal citation omitted).

In *Cherokee County v. N. Cobb Surgical Assocs., P.C.*, 221 Ga. App. 496, 497 (1996), the Georgia Court of Appeals determined that an individual who was shot by police officers during his arrest and brought to the hospital for urgent treatment was an "inmate" under O.C.G.A. § 42-5-2. Following, *Macon-Bibb Cty. Hosp. Auth. v. Hous. Cty.*, 207 Ga. App. 530, 532 (1993), the Court determined that if not for his gunshot injuries, he would have been brought to jail and thus was properly considered an "inmate" under the intent of the statute. *Id*. at 498-499. ("In a like manner, we hold that Cherokee County is responsible for McFarland's medical care because he was injured while being taken into physical custody by the county sheriff's department and who, but for the seriousness of his injuries, would have been placed in the county's detention facility.").

Like the individual in *Cobb*, Mr. Blasingame was injured by Defendant Grubb's while Defendant was detaining Mr. Blasingame. Defendant Grubbs explicitly testified that if Mr. Blasingame was not injured by his tase, Defendant was going to arrest him and take him to jail.  The records at pages 395, 400 and 401 of trial exhibit 12 again confirm that Mr. Blasingame was in custody while the remained in the hospital.  Accordingly, Mr. Blasingame was an "inmate" at the time

he was injured and thus meets this statutory requirement and is therefore entitled to payment of past and present medical expenses incurred while in the custody of City of Atlanta and Atlanta Police Department.

### III.    The District Court erred in denying Plaintiff's motion for costs and fees as the prevailing party.

Finally, the District Court erred in denying Plaintiff's motion for attorney fees. Plaintiff acknowledges that the District Court essentially held Plaintiff's motion in abeyance.  The Court recognized that Plaintiff was the prevailing party at trial, but elected to wait until the conclusion of the appeal before it ruled on the motion for attorney fees. However, because the District Court did not deny that motion in a separate order, Plaintiff included the denial of that motion in his claim of appeal in order to ensure it was properly preserved.

48 U.S.C. § 1988(b) provides that in certain civil rights actions, including those brought under 42 U.S.C. § 1983, the district court, "in its discretion, may allow the prevailing party a reasonable attorney's fees as part of the costs." *Hensley v. Eckerhart,* 461 U.S. 424,426 (1983).

The Eleventh Circuit recognizes that "a plaintiff 'prevails' when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby,* 506 U.S. 103, 111-12 (1992); *accord Dillard v. City of Greensboro,* 213 F.3d 1347, 1353-54 (11th Cir. 2000). There is no doubt that the Plaintiff is a

prevailing party under this standard. Here, Plaintiff was originally awarded with a $100 million jury verdict. The Court reduced Plaintiff's verdict but it did not set aside the jury's verdict in its entirety. Plaintiff's verdict against Defendant Grubbs remains fully intact.

Relatedly, it is well established that a plaintiff who has won substantial relief should not have the attorney's fees reduced simply because the district court did not adopt each contention or claim raised, so long as the claims involve a common core of facts or are based on related legal theories. *Hensley,* 461 U.S. at 435. In this case, Plaintiff succeeded before the jury and this Court on his claim of excessive force against Defendant Grubbs. The fees and costs should not be reduced because the Court set aside part of the jury's verdict award.

## A. Reasonable attorney fees

The Supreme Court has determined that "reasonable fees" under§ 1988 are to be calculated according to the "prevailing market rates in the relevant community." *Blum v. Stenson,* 465 U.S. 886, 895 (1984). The attorney's customary billing rate is ordinarily the best evidence of his market rate. *Id.* (citing *Dillard v. City of Greensboro,* 213 F.3d 1347, 1354-55 (11th Cir. 2000)). Moreover, under *Blum,* the reasonable hourly rate for attorney fees is to be measured by prevailing market rate for the private bar, even if the plaintiffs are represented by a public interest lawyer. 465 U.S. at 893-896 (1984).

42

"The starting point is to determine the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate." *Hensley,* 461 U.S. at 433. The Supreme Court elected to use this lodestar approach because it "produces a more objective estimate and ought to be a better assurance of more even results." *Norman v. Haus. Auth. of Montgomery,* 836 F.2d 1292, 1299 (11th Cir. 1988).

A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation. *Id.* At 1299. (citing *Blum v. Stenson,* 465 U.S. at 895-96 n. 11 ). Furthermore, to determine a reasonable hourly rate the court considers the 12 factors set out in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714 (5th Cir. 1974). *Faught v. American Home Shield Corp.,* 668 F.3d 1233, 1242-42 (11 Cir. 2011 ).[1]  In addition, the Supreme Comi has held that "an enhancement [to an

---

[1] The 12 factors are set forth in *Johnson v. Georgia Highway Express Inc.,* 488 F.2d 714 (5 th Cir. 1974) and derived from the American Bar Association Code of Professional Responsibility, Disciplinary Rule 2-106(1980). The 12 factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

43

attorney's fee] may be appropriate where the method used in determining the hourly rate employed in the lodestar calculation does not adequately measure the attorney's true market value .... " *Perdue v. Kenney A. ex rel. Winn,* 559 U.S. 542, 555 (2010).

Additionally, "[t]here is nothing inherently unreasonable about a client having multiple attorneys, and they may all be compensated if they are not unreasonably doing the same work and are being compensated for the distinct contribution of each lawyer." *Norman* 836 F.3d at 1301. A district court is charged with ensuring that the attorney fees award is reasonable and proper. *Padwjian v. Aventura Limousine & Transp. Serv.,* 441 Fed. Appx. 684, (11th Cir. 2011). It has been held that the court is "itself an expert on the question of fees and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witness as to value." *Norman,* 836 F.2d at 1303.

The calculation of attorney fees in this matter is a relatively straightforward proposition. Under *Hensley,* fees are typically calculated by multiplying the reasonable market rate for an attorney's time by the number of hours reasonably expended on the matter. *Hensley,* 461 U.S. at 433. Moreover, district courts have upheld rates depending on each attorney's experience. *See Weissman v. Williams,* 2018 U.S. Dist. LEXIS 229451, at *7-9 (M.D. Ga. Aug. 28, 2018).

**B. Plaintiff counsel's experience & support for requested fees _Lead Counsel._**

The prosecution of this case was ably led by Attorney Ven R. Johnson of Detroit, Michigan. Atty. Johnson is the principal at Johnson Law, PLC and an experienced plaintiff trial attorney who has over 38-years of experience, primarily in complex personal injury litigation, such as this. By way of background, Atty. Johnson graduated from Kalamazoo College in 1983 and obtained his law degree from the University of Detroit School of Law in 1986. He spent the first **11** years of practice on the civil defense side of the bar before being recruited by Atty. Geoffrey Fieger to work at the Fieger Law Firm in 1995. In 2001, Atty. Johnson became one of Atty. Fieger's pai1ners. After 16 years at the Fieger firm, Atty. Johnson decided to stai1 his own practice in 2011. In just the last 12 years of Johnson Law's existence alone, Atty. Johnson has continued to excel in and out of the court room with verdicts and settlements of well over $650 million.

Atty. Johnson's decades of litigation and trial experience throughout Michigan and around the country have resulted in numerous multi-million-dollar verdicts and settlements for his clients and it has rightfully solidified his professional standing in high regard. The partial list of jury verdicts and his curriculum vitae at ECF No. 186-2 provides a more efficient summary of Atty. Johnson's trial and settlement accomplishments than the pages of this brief will allow. Given Atty. Johnson's years of experience and expertise in trying cases especially, the Honorable Gershwin Drain

45

the United States District Court for the Eastern District of Michigan found that $1,000.00 per hour was a reasonable hourly rate for Atty. Johnson. (ECF No. 186-1). Judge Drain also found the hourly rates requested here by attorneys Ayanna D. Hatchett ($500/hr), Solomon Radner ($450/hr), and Madeline Sinkovich ($350/hr), were reasonable. *Id.*

### Second Chair Trial Counsel-Ayanna D. Hatchett.

Atty. Hatchett is a 16-year attorney, with considerable trial experience primarily focused on personal injury. In 2021, Atty. Hatchett was honored to be chosen by Michigan Lawyers Weekly to be a part of their annual class of Women in the Law. Atty. Hatchett was the primary file handler in this case from January of 2022 through to the present. In accordance with her experience, skill, reputation and the time that she has devoted to this case, Atty. Hatchett requests a reimbursement rate of $500.00 per hour. (ECF No. 186-3).

### Local Counsel.

Darren Tobin, graduated from the University of Georgia School of Law in 2008 and has been in practice for 14 years. 12 of those years have been exclusively in personal injury law for plaintiffs. Atty. Tobin has filed lawsuits in counties across the State of Georgia and he has tried cases in several counties across the state as well. Atty. Tobin's hourly rate at $510.00 is consistent with the fee agreement he uses at his law firm-Tobin Injury Law, in Atlanta, Georgia. (ECF No. 186-3).

46

***Predecessor Counsel.***

Atty. Solomon Radner is an experienced civil rights attorney. Solomon is a founding parent of Excolo Law, which has active civil rights cases in which Solomon is currently lead counsel in many states. Atty. Radner worked this case from the time it was filed while he was still at Excolo Law up through the time when he later resigned from Johnson Law in December of 2021. Given Atty. Radner's experience the hourly rate requested is $450.00. (ECF No. 186-3).

Madeline Sinkovich has been an attorney nearly three years and is admitted to practice in the Eastern and Western Districts of Michigan, as well as the Western District of Texas, and has successfully argued in the Sixth Circuit Court of Appeals on multiple occasions. The hours billed by Atty. Sinkovich also started at Excolo Law with Atty. Radner and ended with Johnson Law in August of 2022. Atty. Sinkovich billed for 43.81 hours of time on this case at a rate of $350.00 per hour. (ECF No. 186-3)

As this Court knows, litigating a civil rights case requires an intricate and sophisticated knowledge of 42 U.S.C. § 1983 as well as the relevant provisions of the United States Constitution. And in cases such as this that have been in suit for three years or more at the time of trial, it also takes an inordinate amount of time and resources that few firms can advance. To try this case through to completion required that Plaintiff's counsel take almost two weeks away from his busy practice in

47

Detroit. Plaintiff's attorneys have alone contributed a total of **453.38 hours.** (ECF No. 186-3).

## C. Fee award for support for paralegals

Work performed by non-attorneys may be considered billable when the work product of an attorney relies on those services provided by clerks and paralegals. *Missouri v. Jenkins,* 491 U.S. 274, 286 (1989) (holding that clerk and paralegal services should be billed at market rates rather than at a rate corresponding to their salaries, benefits and overhead). The Eleventh Circuit has found that a rate of $125 is sufficient compensation for services by non-lawyers. *Walker v. Comm'r, SSA,* 844 F. App'x 104, 106 (11th Cir. 2021).

Plaintiff was fortunate to have three experienced and committed paralegals on their team. Ms. Elizabeth K. Dodson has worked as a paralegal for the last 24 years with some of the most prominent plaintiff attorneys in Michigan, including Geoffrey Fieger and now Ven Johnson. Maria Reyna has been a paralegal for the seven years she has been employed at Johnson Law. Ms. Reyna started working on this file along with Ms. Dodson in January of 2022. Katie Moore preceded the contributions on this file of Ms. Dodson and Ms. Reyna. Ms. Moore was the primary paralegal on this matter at Excolo Law from the time it was filed up through October of 2020. The level of competence provided by each of these professionals was exceptional and deserving of at least $125 .00 per hour. (ECF No. 186-4).

48

The submitted time sheets from both counsel and the support staff will hopefully allow this Court to find that the compensation sought is reasonable considering the large amount of case work required to produce favorable results. Fair discretion was exercised by Plaintiff's counsel in compiling this list and Plaintiff's counsel is certain that not all expended hours have been included, which was done out of an abundance of caution to err on the side of caution, so as not to mislead the court in any way. (ECF No. 186-7).

In short, Atty. Johnson with his team have accumulated **832.44 hours** conducting discovery, legal research, reviewing records, writing, organizing, sorting, summarizing, and trying this case before a jury for seven days. (ECF Nos. 186-3 and 186-4.) The initial result obtained was the jury's 100-million-dollar verdict. When this Court considers the 12 *Johnson* factors through the lens of the facts and circumstances discussed, it will hopefully find that Plaintiff is entitled to the reasonable hourly rates requested.

**D. Plaintiff is entitled to be reimbursed for his reasonable costs**

"Unless a federal statute, these rules, or a court order provides otherwise, costs-other than attorney's fees-should be allowed to the prevailing party." Fed. R. Civ. P. 54(d)(l). The Eleventh Circuit has held that Rule 54(d) "creates a presumption in favor of awarding costs to the prevailing party" which the nonprevailing party must overcome. *Manor Healthcare Corp. v. Lamela,* 929 F.2d 633, 639 (11th Cir.

1991). 28 U.S.C. § 1920 "enumerates expenses that a federal court may tax as a cost under the discretionary authority found in Rule 54( d)." *Id.* ( citing *Crawford Fitting Co. v. J.T. Gibbons, Inc.,* 482 U.S. 437, 441-442 (1987)); *see also Sigley v. Kuhn,* 2000 U.S. App. LEXIS 1465, at *23-26 (6th Cir. Jan. 31, 2000) (distinguishing 28 U .S.C. § 1920 costs in § 1983 case from those under 42 U .S.C. § 1988 as "docket fees, investigation expenses, deposition expenses, witness expenses, and the costs of charts and maps .... have long been recoverable in the court's discretion, as costs pursuant to 28 U.S.C. § 1920."). Plaintiff's recoverable costs total $50,146.33. (ECF No. 186-5).

Additionally, the authority to award a 'reasonable attorney's fee' includes the "authority to award those reasonable out-of-pocket expenses incurred by the attorney which are normally charged to a fee-paying client, in the course of providing legal services." *Trotter v. Columbia Sussex Corp.,* 2010 U.S. Dist. LEXIS 7625, at *36 (S.D. Ala. Jan. 29, 2010) (quoting *Northcross v. Board of Educ.,* 611 F.2d 624, 639 (1979) (citing 42 U.S.C. § 1988)). These expenses can be reasonable photocopying, paralegal expenses, and travel and telephone costs are thus recoverable pursuant to the statutory authority of § 1988." *Northcross,* 611 F.3d at 639. The Eleventh Circuit has upheld awards under Section 1988 for computerized legal research, *Johnson v. University College,* 706 F.2d 1205, 1209 (11th Cir. 1983), postal expenses, *Dowdell*

v Apopka, 698 F.2d 1181, 1192 (11 th Cir. 1983), and copying, *Kenny A. ex rel. Winn v. Perdue,* 532 F.3d 1209, 1219 (11th Cir. 2008).

**E. Plaintiff is entitled to recover post and prejudgment interest**

Plaintiff is entitled to post judgment interest. When a district court taxes costs against a losing party, the award of costs bears interest from the date of the original judgment." *Georgia Ass'n of Retarded Citizens v. McDaniel,* 855 F.2d 794, 799 (11th Cir. 1988). 28 U.S.C. § 1961(a) provides that "the interest rate be the yield of fifty-two-week ( 1 year) Treasury bills, settled immediately prior to the date of judgment; and that 28 U.S.C. § 1961(b) provides that interest be computed daily and compounded annually." *Delong Equip. Co. v. Washington Mills Electro Minerals Corp.,* 997 F.2d 1340 (11th Cir. 1993).

Further, under O.C.G.A § 7-4-12, it is immaterial whether a verdict provides for future interest and judgment. *Lang v. South Ga. Inv. Co.,* 38 Ga. App. 430, (1928). Interest accrues on all judgments in the State of Georgia the rate of 12 percent per annum until it is paid and it is not abated by an appeal. *Threatt v. Forsyth County,* 262 Ga. App. 186, 190 (2003).

Plaintiff is also entitled to prejudgment interest. In *Hardaway,* the court found that O.C.G.A § 51-12-14, which requires written notice for a demand of unliquidated damages to obtain prejudgment interest, was not a prerequisite to an award of

prejudgment interest *ff* the claim is governed by federal law. *Hardaway Constructors, Inc. v. Browning,* 176 Ga. App. 530, cert. denied 475 U.S. 1095 (1986).

Plaintiff's economist, Dr. Michael Thomson, PhD, testified in this trial concerning Plaintiffs past and future damages and he also prepared interest calculations. (ECF No. 186-6.) The table outlines what the post-judgment interest will be depending on when Defendant pays the judgment. *Id.* It also shows the total judgment owed--including pre-judgment interest, attorney fees, and costs, interest-- as of September 22, 2022, which is $43,183.123.76. *Id.*

## CONCLUSION

Mr. Blasingame has had his life forever destroyed by an Officer who used deadly force on him without an inkling of justification and who then destroyed the evidence of his misconduct.  He did so because the City of Atlanta had made it clear over the preceding year that officers could violate the alleged body worn camera policies without consequence.  All of the evidence at trial regarding this point established that it was Atlanta's failures that caused Mr. Blasingame's constitutional rights to be so plainly violated.  This case is precisely what *Monell* and its progeny were designed to remedy.  The District Court, in vacating the verdict as to the City of Atlanta, improperly substituted its judgment for that of the jury.  That decision must be reversed, just as the decisions regarding Plaintiff's entitlement to his medical bills and his attorneys' costs and fees must be reversed.

Respectfully submitted,

*/s/ Christopher P. Desmond*
Christopher P. Desmond (P71493)
Johnson Law, PLC
535 Griswold Street, Suite 2600
Detroit, MI 48226
Tel: (313) 321-8300
cdesmond@venjohnsonlaw.com
*Counsel for Plaintiff-Appellant*

Dated:  August 9, 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation provided in F.R.A.P. 32(a)(7)(B).  The foregoing brief contains 12,983 words of Times New Roman (14 point) proportionate type.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on August 9, 2023, I electronically filed the foregoing paper with the Clerk of the Court using ECF system which will send notification of such filing to all counsel of record in this matter.

/s/ Christopher P. Desmond

53